Jan LOWREY, Plaintiff,

v.

TEXAS A & M UNIVERSITY SYSTEM d/b/a Tarleton State University; Dr. Dennis McCabe, Individually and as President of Tarleton; Mr. Lonn Reisman, Individually and as Athletics Director of Tarleton; Dr. Lamar Johanson, Individually and as Faculty Athletics Representative of Tarleton; and Mr. Jim Johnson, Individually and as Men's Athletics Coordinator and NCAA Compliance Officer of Tarleton, Defendants.

No. CIV. A. H–96–0834.

United States District Court, S.D. Texas, Houston Division.

May 27, 1998.

Diane Madeline Henson, Austin, TX, La-Nelle L. McNamara, McNamara & McNamara, Waco, TX, for Jan Lowrey, Plaintiff.

Dona Glimm Hamilton, Office of Attorney General, Austin, TX, for Texas A & M University System, Dennis McCabe, Lonn Reisman, Lamar Johanson, Jim Johnson, Pat Stevenson, Susan Burton, Defendants.

## OPINION AND ORDER

LAKE, District Judge.

The former Women's Basketball Coach at Tarleton State University alleges that the university and four of its officials discriminated against her on the basis of her sex and retaliated against her when she complained. Pending before the court is Defendants' Amended Motion for Summary Judgment (Docket Entry No. 30). The court will grant in part and deny in part the motion.

### I. BACKGROUND

Tarleton State University (Tarleton) is a four-year coeducational institution of higher education located in Stephenville, Texas.[1]

---

1. *See* Tex. Educ.Code Ann. § 87.001 (Vernon 1996).

Tarleton is managed and controlled by the Board of Regents of the Texas A & M University System.[2] Dr. Dennis McCabe is the President of Tarleton.[3] Lonn Reisman is Men's Basketball Coach and Athletics Director.[4] Dr. Lamar Johanson is Dean of the College of Arts and Sciences and Tarleton's Faculty Representative to the NCAA.[5] Jim Johnson is the Men's Athletics Coordinator and the NCAA Compliance Coordinator for Tarleton and a physical education teacher.[6]

## A. Twenty Years of Coaching

Jan Lowrey became Women's Basketball Coach at Tarleton in the fall of 1976.[7] Over the next twenty years Lowrey's teams were very successful. Her teams won twenty or more games in each of her first nine years as coach.[8] They won several conference championships, and in 1992 the team placed second in the Division II national women's basketball tournament.[9]

Lowery's success did not lead to improved conditions for the women's basketball team. For example, the locker room used by the women's team from the early 1980s was the former men's visiting-team dressing room. The room had "a 'gang' shower, four urinals and one toilet, one sink, no dressing tables, no outlets for hair dryers, no storage, and inadequate lockers." [10] Tarleton repeatedly ignored requests from Lowrey for renovations. Lowrey and the team manager ultimately installed shower rods and curtains to divide the showers. Tarleton finally removed the urinals in 1996, but it did not install toilets to replace them.[11]

In 1988 Tarleton hired Lonn Reisman as Men's Basketball Coach. During his first year Reisman's salary was less than Lowrey's.[12] The year before Reisman was hired the men's team won three games and lost twenty-five. In Reisman's first year (1988–89) the men's team improved its record to eighteen wins and eleven losses. The women's team had twenty wins and ten losses that year. Both Lowrey and Reisman received a $1,400 raise in salary as a reward for their winning seasons.[13] In the Spring of 1989 then-Tarleton President Barry Thompson created the position of Assistant Athletics Director and appointed Reisman to the post.[14] Tarleton did not give Lowrey an opportunity to apply for this position.[15] Reisman then held the positions of Assistant Athletics Director, Men's Basketball Coach,

**2.** *Id.* Texas A & M University, originally chartered as the Agricultural and Mechanical College of Texas, was the first public institution of higher education in Texas. From an initial enrollment of six male cadets in 1876, it has grown to become the third-largest university in the United States, with an annual enrollment exceeding 40,000 men and women. The college changed its name to Texas A & M University in 1963. Texas A & M University is one of several educational institutions that comprise the Texas A & M University System. Other member institutions include Prairie View A & M University, Tarleton State University, Texas A & M University at Galveston, Texas A & M University–Kingsville, Texas A & M University–Corpus Christi, Texas A & M International University, East Texas State University, East Texas State University at Texarkana, The Texas A & M University System–College of Dentistry, and Public University for Central Texas. *See generally* Tex. Educ.Code Ann. ch. 87 (Vernon's Supp.1998).

Jan Lowrey alleges no wrongdoing on the part of Texas A & M University. Her claims focus solely on events at Tarleton State University. Her suit names the Texas A & M University System only insofar as the system did business as Tarleton State.

**3.** McCabe Deposition at 36.

**4.** Reisman Deposition at 5.

**5.** Johanson Deposition at 7, 14.

**6.** Johnson Deposition at 6.

**7.** In addition to naming Lowrey head coach, Tarleton also appointed her as an instructor in the Physical Education Department. Lowrey Affidavit ¶ 2; Tarleton personal action form, Lowery Affidavit, Ex. 3.

**8.** Lowrey Affidavit ¶ 8.

**9.** Lowrey Affidavit ¶ 22.

**10.** Lowrey Affidavit n. 3.

**11.** Lowrey Affidavit at page 8 unnumbered footnote; February 7, 1996, memorandum from Lowrey to Reisman, Lowrey Affidavit, Ex. 10.

**12.** Lowrey Affidavit ¶ 23; 1989–90 Budget at 2054, 2060, Lowrey Affidavit, Ex. 2.

**13.** Reisman deposition at 126.

**14.** Reisman Deposition at 24–25; Lowrey Affidavit ¶¶ 10, 12–13.

**15.** Lowrey Affidavit ¶ 10.

and a physical education instructor.[16] By the 1989–90 fiscal year, Reisman's second year at Tarleton and his first year as Assistant Athletics Director, Tarleton was paying Reisman a higher salary than it paid Lowrey, who by then had coached and taught at the university for thirteen years. Tarleton paid Reisman $36,899 and Lowrey $31,137 that year.[17]

On August 27, 1993, Dr. Ron Newsome, Tarleton's Athletics Director, resigned.[18] Although Lowrey was a head coach in the Athletics Department, she learned of Newsome's resignation through the press, not from the university.[19] Over the next few days a Tarleton search committee interviewed three candidates to fill the vacancy: Reisman, Lowrey, and the new football coach, Ronnie Roemisch.[20] On September 1, 1993, McCabe offered the position of Athletics Director to Reisman.[21] Dr. McCabe explained to Lowrey that although she was equally qualified for the position, "he 'was going with Lonn.'"[22]

Lowrey asked Reisman and McCabe to create the position of Associate Athletics Director for her, with a raise in pay commensurate with the duties and responsibilities of such an office. Instead, Reisman offered her the position of Women's Athletics Coordinator.[23] Although this position required Lowrey to assume several new duties,[24] the evidence is unclear whether she received an increase in pay for taking this position.[25]

16. Tarleton State University Personnel Action Form, Lowrey Affidavit, Ex. 4.

17. 1990–91 Budget at 2072–73, Lowrey Affidavit, Ex. 2.

18. Lowrey Affidavit ¶ 44.

19. Lowrey Affidavit ¶¶ 44–45.

20. McCabe Deposition at 168; Lowrey Affidavit ¶ 45.

21. McCabe Affidavit ¶ 1.

22. Lowrey Affidavit ¶ 47.

23. October 22, 1993, memorandum from Reisman to Lowrey, Lowrey Affidavit, Ex. 36; October 25, 1993, letter from Lowrey to Reisman, Lowrey Affidavit, Ex. 37; Lowrey Affidavit ¶ 58. The record is unclear exactly when Lowrey became Women's Athletics Coordinator. In her affidavit and deposition, Lowrey testified that then-Athletics Director Dr. Ron Newsome approved her as the new "women's athletics coordinator" in the fall of 1992. (Lowrey Affidavit §§ 35–36; Lowrey Deposition at 42–44.) However, according to Jerry Graham, Tarleton's Vice–President for Finance and Administration, this was only an internal designation and not an official title. (Graham Affidavit at 2.) The evidence indicates that Lowrey, as the sole female coach in the Athletics Department, apparently coordinated women's athletic activities to some extent as "women's athletics coordinator" beginning in 1992, but that the university administration did not create an official position until 1993 when the new Athletics Director, Reisman, appointed her "Women's Athletics Coordinator." At no time were funds from the Athletics Administration Budget used to compensate Lowrey despite her role as a quasi-administrator.

24. Specifically, the Women's Athletics Coordinator job description required that Lowrey:
(1) assist the Athletics Director in the day-to-day operations of the Athletics Department;
(2) serve as a department co-supervisor in the Athletics Director's absence,
(3) keep regular office hours;
(4) manage facilities and game administration at all women's athletic events;
(5) serve as Tarleton's University Interscholastic League (UIL) Coordinator for girls' sports;
(6) coordinate the Girls' Regional Basketball Tournament;
(7) assist the track coach in organizing and running girls' events at the UIL Regional Track Meet;
(8) supervise the directors of the golf and tennis tournaments;
(9) attend all home events in women's track and tennis, except when her own basketball coaching duties created a time conflict;
(10) assist the coaches of the other women's teams in running their programs, *except* for financial issues;
(11) assist and attend all fundraising events for women's sports, except when her own coaching duties interferred;
(12) serve as a liaison between Tarleton's women's athletic programs and the university and Stephenville community;
(13) assist in organizing and running all playoff contests, whether high school or collegiate, held at Tarleton;
(14) provide input to the Athletics Director in hiring decisions for women's athletics; and
(15) perform any other duties assigned by the Athletics Director or the Physical Education Department Chair.
See October 22, 1993, memorandum from Reisman to Lowery, Lowrey Affidavit, Ex. 36.

25. October 25, 1993, letter from Lowrey to Reisman, Lowrey Affidavit, Ex. 36; Lowrey Affidavit ¶¶ 58, 60.

Earlier that year, on January 28, 1993, McCabe had appointed Lowrey to a special task force to study gender equity at Tarleton.[26] On November 17, 1993, Dr. Janet Schmelzer, an Associate Professor of History at Tarleton, filed a complaint with the Department of Justice's Office of Civil Rights (OCR) alleging sex discrimination at Tarleton in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (1994).[27] Schmelzer's complaint included several allegations of Title IX violations in Tarleton's Athletics Department. In May of 1994, Schmelzer agreed to withdraw her complaint while the parties attempted to mediate the dispute.[28]

Beginning in April of 1994 Reisman began filing several "incident reports" in Lowrey's personnel file, noting among other problems, days when Lowrey was absent from work, arrived late, or left early without notifying Reisman.[29] On September 29, 1994, Reisman conducted a performance review of Lowrey and gave her an average rating of 2.0 on a scale of 1 to 5 (lowest to highest) in nine categories.[30] Reisman sent a copy of the review to Lowrey on October 3, 1994.[31] On October 5, 1994, Reisman recommended that McCabe terminate Lowrey as Women's Athletics Coordinator.[32] Reisman did not notify Lowrey of his recommendation. Reisman reiterated his views in an October 26, 1994, memorandum to McCabe, stating that he "strongly recommend[ed] the reassignment of Ms. Jan Lowrey from Women's Athletics Coordinator/Head Women's Basketball Coach, effective immediately, to Head Women's Basketball Coach."[33]

In an October 28, 1994, letter Schmelzer reminded McCabe of his promise not to allow retaliation against persons who spoke to her regarding matters raised by her OCR complaint and warned him that Title VI would forbid such retaliation regardless of McCabe's promises.[34] On November 4, 1994, President McCabe reassigned Lowrey. She remained Women's Basketball Coach and an instructor in the Physical Education Department, and her salary did not change.[35] Eventually, Lowrey sought employment elsewhere. She resigned from Tarleton on July 15, 1996, and took the head coach's position for the San Jose Lasers, a professional women's basketball team.[36] The Lasers released her from her two-year contract after her first year with the club.[37] She still earns a salary under her contract with the Lasers, but is not currently coaching basketball.[38]

## B. Litigation Summary

On September 1, 1995, Lowrey filed Civil Action H–95–4335 in this court alleging employment discrimination and retaliation in violation of Title IX of the Civil Rights Act of 1972, 20 U.S.C. §§ 1681–1688 (1994), and intentional infliction of emotional distress under Texas common law. The action was assigned to another member of the court. Lowrey's complaint named the Texas A & M University System, d/b/a Tarleton State University, as well as Dr. Dennis McCabe, Mr. Lonn Reisman, Dr. Lamar Johanson, Mr. Jim Johnson, Ms. Pat Stevenson, and Ms. Susan Burton in their individual and official capacities, as defendants. When the defendants moved for dismissal, Lowrey sought

26. January 28, 1993, memorandum from McCabe to Lowrey, et al., Lowrey Affidavit, Ex. 23.

27. November 17, 1993, letter from Dr. Janet Schmelzer to the Regional Civil Rights Director, Lowrey Affidavit, Ex. 40.

28. Report on Early Complaint Resolution Meeting on May 24, 1994, Lowrey Affidavit, Ex. 43.

29. Memoranda to File of various dates, Lowrey Affidavit, Ex. 41.

30. September 29, 1994, Performance Review for Supervisor/Managerial Employees, Lowrey Ex. 45.

31. October 3, 1994, memorandum from Reisman to Lowrey, Lowrey Affidavit, Ex. 45.

32. October 5, 1994, memorandum from Reisman to McCabe, Lowrey Affidavit, Ex. 46.

33. Lowrey Affidavit, Ex. 49.

34. Lowrey Affidavit, Ex. 48.

35. November 4, 1994, memorandum from McCabe to Lowrey, Lowrey Affidavit, Ex. 50.

36. Lowrey Deposition at 4.

37. Lowrey Deposition at 165.

38. Lowrey Deposition at 169–70.

leave to amend her complaint to add claims under Title VII, the Equal Pay Act, 42 U.S.C. § 1983, and the First, Fifth, and Fourteenth Amendments to the United States Constitution. Without addressing Lowrey's motion for leave to amend, the court dismissed the action and entered a final judgment in favor of the defendants. Lowrey appealed. *See generally Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 245 (5th Cir.1997) (hereinafter *Lowrey I* ).

On March 12, 1996, while her appeal was pending, Lowrey filed the present action, Civil Action H–96–0834, that included the causes of action she had sought to add to Civil Action H–95–4335. This new action was assigned to the undersigned judge. On December 3, 1996, Lowrey filed an amended complaint in the new action against the Texas A & M University System d/b/a Tarleton State University and McCabe, Reisman, Johanson, and Johnson in both their individual and official capacities. All defendants filed a motion to dismiss and for summary judgment on January 31,.1997.

On July 7, 1997, the court of appeals affirmed in part, reversed in part, and remanded Civil Action H–95–4335. The court held that the district court had abused its discretion by failing to allow Lowrey to amend her complaint, but that the error was moot because she had refiled under Civil Action H–96–0834 the same causes of action that she had attempted to amend to her first suit. *Lowrey I,* 117 F.3d at 246. The court affirmed the district court's dismissal of Lowrey's employment discrimination claim brought under Title IX, but reversed and remanded the dismissal of Lowrey's Title IX retaliation claim.

On August 14, 1997, the defendants filed an unopposed motion to consolidate Civil Action H–95–4335 into Civil Action H–96–0834. At an August 22, 1997, hearing the court granted the motion and granted in part and denied in part defendants' motion to dismiss and for summary judgment. The court also ordered Lowrey to amend her complaint to plead her claims more adequately in light of the individual defendants' qualified immunity defense and Tarleton's sovereign immunity defense.

In compliance with the court's order, Lowrey filed her Second Amended Complaint on September 25, 1997. This complaint raises three general causes of action: discrimination in pay, retaliation, and due process violations, each relying on various constitutional, statutory, or common-law rights.

On January 16, 1998, defendants filed an Amended Motion for Summary Judgment, arguing that:

(1) the two-year statute of limitations bars Lowrey's claims under § 1983 and the Equal Pay Act that accrued more than two years prior to the filing of this suit;

(2) Lowrey cannot establish a *prima facie* case of discrimination in pay under Title VII and the Equal Pay Act;

(3) Lowrey cannot establish a *prima facie* case of retaliation under Title VII or Title IX for her removal as Women's Athletics Coordinator;

(4) the individual defendants are entitled to qualified immunity against Lowrey's First Amendment retaliation claim; and

(5) Lowrey cannot prevail on her due process claims under § 1983 because she cannot show a deprivation of a property interest.

## C. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure governs the propriety of summary judgment. Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.,* 92 F.3d 336, 338 (5th Cir.1996); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir. .1996). The Supreme Court has interpreted the plain language of Rule 56(c) as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d

265 (1986); *see Gunaca v. Texas,* 65 F.3d 467, 469 (5th Cir.1995).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) *(en banc )* (quoting *Celotex,* 106 S.Ct. at 2553). "The movant accomplishes this by informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues." *Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir.1996) (citing *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992)). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little,* 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments Inc.,* 100 F.3d 1173, 1180 (5th Cir.1996); *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir.1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075.

Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace,* 80 F.3d at 1047; *accord, S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 494 (5th Cir.1996). The court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *as modified,* 70 F.3d 26 (5th Cir.1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Texas Instruments Inc.,* 100 F.3d at 1179.

When affidavits are used to support or oppose a motion for summary judgment they "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *Beijing Metals & Minerals Import/Export Corp. v. American Bus. Center, Inc.,* 993 F.2d 1178, 1182 (5th Cir.1993). Affidavits that are not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an affidavit that do not comply with Rule 56(e) are not entitled to any weight and cannot be considered in deciding a motion for summary judgment. *Richardson v. Oldham,* 12 F.3d 1373, 1378–79 (5th Cir.1994). Neither shall conclusory affidavits suffice to create or negate a genuine issue of fact. *McCallum Highlands,* 66 F.3d at 92; *Travelers Ins. Co. v. Liljeberg Enters., Inc.,* 7 F.3d 1203, 1207 (5th Cir. 1993); *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992).[39]

---

**39.** In their Reply to Plaintiff's Response to Defendants' Amended Motion for Summary Judgment [Docket Entry No. 35], the defendants object to the admissibility of Lowrey's summary judgment evidence. First, they argue that Jan Lowrey's eight-six paragraph affidavit is inadmissible because it includes conclusory statements, speculation, and hearsay. The defendants' concerns are often well-founded. Lowrey's affidavit frequently strays from personal knowledge and includes rumors as well as legal conclusions. However, the affidavit also includes statements of her personal knowledge. Instead of excluding the affidavit in its entirety, the court will limit its reliance on the affidavit to those statements reflecting Lowrey's personal knowledge.

Defendants also object to the documentary evidence offered by Lowrey as not properly authenticated. Lowrey cured this defect by filing an authenticating affidavit in her Supplemental Response to Defendants' Amended Motion for Summary Judgment [Docket Entry No. 37]. (Affidavit of LaNelle L. McNamara, Supplemental Response, Ex. A) Defendants also raise specific objections to the following exhibits attached to Lowrey's affidavit: Exhibits 11, 12, 22, 26, 27, 29, 38, 40, 42, 43, 47, 48, and 51–54. The court has not relied on Exhibits 11, 12, 22, 26, 38, or 51–54. Exhibits 27, 29, 40, 42, 47, and 48 are not hearsay, and therefore are admissible, because they are not offered for the truth of the matter asserted therein. *See* Fed.R.Evid. 801(c). Moreover, Exhibits 27 and 29 are admissions by

To analyze and evaluate the issues raised in the Amended Motion for Summary Judgment most efficiently, the court will address the limitations issue first. The court will then proceed to Lowrey's pay discrimination claims. The court will conclude by examining individually Lowrey's three retaliation claims (Title VII, Title IX, and First Amendment).[40]

## II. STATUTE OF LIMITATIONS

Defendants raise the defense of limitations to two of Lowrey's claims. At the end of their argument on qualified immunity under Lowrey's § 1983 First Amendment claims, defendants add in passing: "Defendants would also assert the statute of limitations with regard to any allegations for which Plaintiff seeks recovery under 42 U.S.C. § 1983 beyond two years from the date of filing of this lawsuit."[41] Similarly, at the end of their argument challenging Lowrey's Equal Pay Act claim, the defendants remark: "Plaintiff's claims prior to March 12, 1994 (two years prior to filing of her lawsuit) are barred by the statute of limitations."[42] Defendants later corrected this argument in their reply to Lowrey's response: "Inadvertently, Defendants asserted statute of limitations with regard to Plaintiff's Equal Pay Act claims for actions 'prior to March 12, 1994'[;] this should read 'prior to September 2, 1993.'"[43]

Lowrey expresses astonishment at the defendants' attempt to raise the defense of limitations. While Civil Action H–95–4335 was on appeal, the Texas Attorney General assured the Fifth Circuit that it would not raise any affirmative defenses in general, and limitations in particular, in Civil Action H–96–0834. See Lowrey I, 117 F.3d at 246 n. 4. As a result of this waiver, the court explicitly held that "Tarleton is judicially estopped from raising any affirmative defenses to the second lawsuit [H–96–0834] that could not have been raised in the instant case [H–95–4335], had the district court properly granted leave to file the amended complaint." Id. (emphasis added).

■ Limitations is an affirmative defense. Ingraham v. United States, 808 F.2d 1075, 1078 (5th Cir.1987); see Fed.R.Civ.P. 8(c) (listing limitations as an affirmative defense that defendants must include in their answer). Because limitations is an affirmative defense, defendants would have the burdens of proof and persuasion at trial. Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997). In a motion for summary judgment defendants thus have the burden of "present[ing] admissible evidence legally sufficient to sustain a finding favorable to [them] on each element of that defense." Id.

Lowrey filed her first lawsuit on September 1, 1995. The defendants are therefore estopped by Lowrey I from asserting limitations on any claim that accrued after August 31, 1993, because Lowrey could have brought such claims in H–95–4335.

■ Defendants do not explain when any of Lowrey's claims accrued, nor do they identify evidence supporting their limitations defense; they simply allege that some of her claims are time-barred. A court may dismiss

---

a party opponent and therefore not hearsay. See Fed.R.Evid. 801(d)(2). The documents designated as Exhibit 43 fall within the recorded-recollection hearsay exception and could be read into evidence at trial. See Fed.R.Evid. 803(5).

Defendants also object to the admissibility of the depositions of Lowrey's experts Dr. Donna Lopiano and Dr. Christine Grant. The court has not relied on any of their opinions in deciding the issues raised by defendants' motion for summary judgment.

**40.** Although Lowrey alleges other claims, she never responds to Defendants' Amended Motion for Summary Judgment on many of them. For example, Lowrey never addresses defendants' arguments about her due process claims and her

claims under Texas Civil Practices and Remedies Code, and she concedes that sovereign immunity bars her due process claim arising out of a breach of contract. Therefore, pursuant to Fed. R.Civ.P. 56(e) and Local Rule 6(E), the court will grant the defendants' motion for summary judgment as to all of these claims and will address only the claims that remain.

**41.** Defendants' Amended Motion for Summary Judgment at 12.

**42.** Defendants' Amended Motion for Summary Judgment at 1.

**43.** Defendants' Reply to Plaintiff's Response at 9.

claims on the pleadings only when the face of the pleadings clearly show the claims to be time-barred. *White v. Padgett*, 475 F.2d 79, 82 (5th Cir.1973). Such a dismissal is appropriate only when nothing further could be developed by pretrial discovery or a trial on the merits. The court concludes that the face of the pleadings do not disclose facts sufficient to support dismissal of any of Lowrey's claims under the statute of limitations. Indeed, the defendants' arguments are so sketchy that the court cannot determine exactly which claims or which actions allegedly fall outside the limitations period. Accordingly, the court will deny Defendants' Amended Motion for Summary Judgment to the extent that it is based on the statute of limitations.

## III. *DISCRIMINATION IN PAY*

Lowrey has sued Tarleton for discrimination in pay under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1994), and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1994). Tarleton argues that Lowrey cannot establish a *prima facie* case under either statute. While each statute requires a slightly different analytical approach, Tarleton raises the same basic argument on each claim. The court will therefore examine Lowrey's pay-discrimination claims together.

### A. Equal Pay Act Standards

The Equal Pay Act prohibits discrimination by employers against employees

> by paying wages to employees … at a rate less than the·rate at which [the employer] pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions.

29 U.S.C. § 206(d)(1) (1994).

As with most employment discrimination claims, the court must analyze Lowrey's Equal Pay Act claim by using a shifting-burdens framework. First, Lowrey must establish a *prima facie* case of discrimination in pay. If Lowrey satisfies this initial hurdle, the burdens of production and persuasion[44] shift to Tarleton to show that the difference in pay falls within one of the four exclusive affirmative defenses enumerated by the Equal Pay Act.[45] *Jones v. Flagship Int'l*, 793 F.2d 714, 722 (5th Cir.1986); *see Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). Because Tarleton focuses solely on Lowrey's *prima facie* case and does not assert any of the four affirmative defenses, the court will limit its analysis to whether Lowrey has raised a *prima facie* case.

■■■ To establish a *prima facie* case of discrimination under the Equal Pay Act Lowrey must show that:

(1) Tarleton is subject to the Equal Pay Act;

(2) she performed work that required equal skill, effort, and responsibility under similar working conditions; and

(3) Tarleton paid her less than the male employee providing the basis for comparison.

*See Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir.1993); *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.1987); *Jones*, 793 F.2d at 722–23; *see also Corning Glass Works*, 94 S.Ct. at 2228. "[P]roof of discriminatory intent is not required to establish a *prima facie* case under the Equal Pay Act." *Peters*, 818 F.2d at 1153 (emphasis added). Tarleton does not deny that it is subject to the Equal Pay Act.

**44.** Normally in employment discrimination cases, only the burden of production shifts to the defendant after the plaintiff establishes a *prima facie* case. *See, e.g., Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089 (5th Cir.1995); *Peters v. City of Shreveport*, 818 F.2d 1148, 1155 (5th Cir.1987). Under the Equal Pay Act, however, the burden of persuasion also shifts to the defendant because once a plaintiff establishes a *prima facie* case the defendant cannot avoid liability except by proving one of the four statutory affirmative defenses enumerated in the Equal Pay Act. *See Peters*, 818 F.2d at 1154–55.

**45.** An Employer may avoid liability by showing that the unequal pay occurred:

(1) under a seniority system;

(2) under a merit system;

(3) under a system measuring salary by quality or quantity of production; or

(4) based on any factor besides sex.

*See* 29 U.S.C. § 206(d)(1) (1994).

## B. Title VII Standards

■ Title VII covers a broader range of discriminatory pay practices than does the Equal Pay Act. While the Equal Pay Act only addresses the "classic" sexually discriminatory practice of unequal pay for equal work, Title VII also prohibits employers from paying women less than the worth of their jobs simply because they are women. *See Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1131–32 (5th Cir.1983); *see generally County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■ Unlike the Equal Pay Act, however, Title VII requires plaintiffs to prove that their employer acted with discriminatory intent. *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.1987). Title VII pay-discrimination claims therefore employ a slightly different analytical approach. The plaintiff must first establish a *prima facie* case of discrimination. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1089 (5th Cir.1995); *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir.1984). If the plaintiff does so, the burden shifts to the defendant to produce evidence [46] that its actions were based on legitimate, nondiscriminatory reasons. If the defendant meets this burden, "the presumption of discriminatory intent derived from the plaintiff's *prima facie* case 'simply drops out of the picture' . . . and 'the ultimate question [becomes] discrimination *vel non.*'" *Mayberry*, 55 F.3d at 1090 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2749, 2753, 125 L.Ed.2d 407 (1993)).

■ To establish a *prima facie* case of pay discrimination under Title VII Lowrey must show that:

(1) she is a member of a protected class, and

(2) she was paid less than a nonmember for work that required substantially the same responsibility.

*See Uviedo*, 738 F.2d at 1431. This analysis applies even when the two employees being compared worked at different times for the employer. *Id.* Tarleton does not deny that Lowrey is a member of a protected class. Instead, as with her Equal Pay Act claim, Tarleton contends that it paid her as much or more than the man to whom she compares herself.

## C. Analysis

■ For the purposes of her pay-discrimination claims, Lowrey compares herself to Jim Johnson, who held the position of Men's Athletics Coordinator, and Pat Stevenson, who succeeded her as Women's Athletics Coordinator. Lowrey cannot use Stevenson as a basis for comparison because Stevenson is a woman. The Equal Pay Act only prohibits pay differences between members of the opposite sex. *See* 29 U.S.C. § 206(d)(1) (1994). Title VII relies on comparisons to nonprotected classmembers. Since Lowrey and Stevenson are both women, Stevenson cannot provide a viable comparison for Lowrey's Equal Pay Act or Title VII claims. The court will therefore focus on Lowrey's comparison to Johnson.

Lowrey held the official position of Women's Athletics Coordinator from October of 1993 to November of 1994.[47] During this period Johnson coached women's volleyball and men's golf, taught in the Physical Education Department as an instructor, and held the positions of Men's Athletics Coordinator and NCAA Compliance Coordinator. Thus,

**46.** Only the burden of production shifts to the defendant under Title VII. The burden of persuasion always remains with the plaintiff in Title VII cases. *See Peters*, 818 F.2d at 1154–55.

**47.** As noted above, the evidence does not clearly establish when Lowrey became Women's Athletics Coordinator. *See supra* note 23. The parties agree that she assumed additional duties in 1992 as an informal "women's athletics coordinator," but the evidence shows that Tarleton did not establish the official position of "Women's Athletics Coordinator" or grant Lowrey that title until October of 1993. Title VII and Equal Pay Act claims do not proceed simply on the basis of person's title, but on the responsibilities and duties of the title-holder. Therefore, to some extent, *when* Lowrey became "Women's Athletics Coordinator" and not just "women's athletics coordinator" is tangential to this discussion. However, Tarleton argues that because it gave Lowrey a raise when she became "women's athletics coordinator," she has no reason to complain that she did not receive another raise when she became "Women's Athletics Coordinator."

both Lowrey and Johnson held the positions of Women's Athletics Coordinator, head coach, and instructor concurrently. Tarleton does not deny that the two had comparable duties and responsibilities in their respective positions. The dispute centers on whether Lowrey received adequate, equal pay for her work as Athletics Coordinator. The court concludes that issues of fact preclude summary judgment on this issue.

Lowrey claims that she received no increase in pay when she became Women's Athletics Coordinator; in other words, that Tarleton did not compensate her for the new position.[48] However, she claims that Johnson did receive extra pay for his new positions. The 1993–94 Tarleton Athletics Budget anticipated paying Johnson a total salary of $19,570 for that fiscal year.[49] The 1994–95 budget shows that Tarleton actually paid Johnson $25,000 for the 1993–94 fiscal year, $5,430 more than budgeted.[50] Johnson became Men's Athletics Coordinator during the 1993–94 fiscal year.[51]

Lowrey argues that the additional salary that Johnson received was compensation for his work as Men's Athletics Coordinator. The 1993–94 budget shows all of Johnson's anticipated $19,570 salary as coming out of the golf, volleyball, and physical education budgets.[52] The 1994–95 budget shows that $15,938 came out of the golf and physical education budgets. The remaining $9,062 of Johnson's salary came from Athletics Administration.[53] None of Lowrey's salary came out of Athletics Administration. The evidence thus shows that Johnson, who held a quasi-administrative position, received $9,062 from the Athletics Administration Budget, while Lowrey, who held a similar quasi-administrative position, received nothing from the Athletics Administration Budget.

Moreover, Johnson's overall salary increased by $5,430 after he assumed the positions of Men's Athletics Coordinator and NCAA Compliance Coordinator while Lowrey's salary did not rise at all when she assumed the official position of Women's Athletics Coordinator. Tarleton admits that Johnson's salary rose by $5,430, but argues that Lowrey also received a raise that was greater than Johnson's. According to Jerry W. Graham, Tarleton's Vice–President for Finance and Administration, Tarleton increased Lowrey's appointment from a 9–month position to a 10.5–month position and raised her salary by 10% when she assumed the informal role of Women's Athletics Coordinator in 1992. This resulted in a total raise of $9,359.[54] When Johnson assumed the official position of Men's Athletics Coordinator, his appointment increased from 9.5 months to 12 months, and he received a 1.13% increase in salary.[55]

Since Lowrey's raise came in the fall of 1992 she received her salary increase more than a year before Johnson. The 1992–93 budget anticipated paying Lowrey $33,033 for that fiscal year.[56] The 1993–94 budget records Lowrey as having actually earned $43,664 for the 1992–93 fiscal year.[57] The evidence thus shows that Lowrey received a

---

48. Lowrey Affidavit ¶ 60.

49. 1993–94 Budget at 2111, Lowrey Affidavit, Ex. 2.

50. 1994–95 Budget at 2122, Lowrey Affidavit, Ex. 2.

51. Graham Affidavit at 2.

52. 1993–94 Budget at 2111, Lowrey Affidavit, Ex. 2.

53. 1994–95 Budget at 2122, Lowrey Affidavit, Ex. 2.

54. The court does not understand the basis for Graham's conclusion that Lowery received a 10% increase in salary, and Graham does not cite any supporting documentation for his conclusion.

55. Graham Affidavit at 2.

56. 1992–93 Budget at 2100, Lowrey Affidavit, Ex. 2.

57. 1993–94 Budget at 2115, Lowrey Affidavit, Ex. 2. The difference in salary between 1992–93 and 1993–94 is $10,631, which is more than the $9,359 raise Graham discusses in his affidavit.

The court has not lost sight of the fact that in terms of overall compensation, Lowrey always earned significantly more than Johnson. Lowrey does not contend that Tarleton violated the Equal Pay Act in terms of overall salary. Her contention is that while Tarleton paid Johnson extra compensation above his teaching and coaching pay when he became Men's Athletics Coordinator, the university paid her nothing extra to be Women's Athletics Coordinator. In other words, Johnson received at least $5,000 to be Men's

substantial raise around the time she assumed the informal, *de facto,* role of women's athletics coordinator. Unlike Johnson, however, none of Lowrey's salary came out of the Athletics Administration Budget; it all came out of the women's basketball and physical education budgets.[58]

The parties offer contrary interpretations of the evidence. On the one hand, Lowrey received a significant salary increase when she assumed additional responsibility in 1992 as an informal women's athletics coordinator. Tarleton interprets this raise as at least partial compensation for her coordinator duties. On the other hand, none of this extra salary came out of the Athletics Administration budget, while some of Johnson's raise came from the Athletics Administration budget. The evidence is thus ambiguous as to whether Lowrey's increased salary was a raise in her coaching and teaching compensation or an additional payment for having assumed a new administrative role.

This ambiguity is magnified by the fact that Tarleton did not create the official position of Women's Athletics Coordinator until 1993. The parties do not dispute that Lowrey had a *de facto* coordinating role beginning in the fall 1992. She did not assume the official position of Women's Athletics Coordinator, however, until October 25, 1993, when she accepted Reisman's offer of the position.[59] There is thus a fact issue as to when Lowrey became entitled to extra compensation for her duties in that position.

Moreover, Graham's affidavit does not explain why the Athletics Administration Budget contributed to Johnson's salary but not to Lowrey's. When Pat Stevenson became the new Women's Athletics Coordinator, part of her salary came out of Athletics Administra-

Athletics Coordinator while Lowrey received nothing.

tion.[60] Of the three Coordinators, only Lowrey received no compensation from Athletics Administration while she served as an athletics coordinator.

In summary, the evidence presents the following issues of fact on Lowery's discrimination in pay claims:

(1) When did Lowrey become Women's Athletics Coordinator?

(2) Did her 1992 raise only compensate her for coaching and teaching, or did it also compensate her for her service as women's athletics coordinator?

(3) If Lowrey's 1992 raise did not compensate her for her coordinator work, did Johnson receive compensation for his work as Men's Athletics Coordinator?

Because Lowrey has met her burden of establishing issues of fact on her claims under both the Equal Pay Act and Title VII, the court will deny defendants' motion for summary judgment on those claims.

## IV. *RETALIATION*

Lowrey alleges that defendants are liable are under Title VII, Title IX, and 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution for retaliating against her in response to comments she made criticizing the university and its officials on gender equity issues.

### A. Title VII

Title VII prohibits employers from retaliating against employees for filing a discrimination charge or otherwise exercising their rights under Title VII. *See* 42 U.S.C. § 2000e–3 (1994). To establish a *prima facie* case of retaliation under Title VII a plaintiff must show that:

**59.** October 25, 1993, letter from Lowrey to Reisman, Lowrey Affidavit, Ex. 36.

---

**58.** A logical conclusion from Tarleton's argument would be that the women's basketball team and the Physical Education Department necessarily footed the entire bill for Lowrey's salary as Women's Athletics Coordinator. Tarleton offers no evidence that any men's team was similarly called upon to pay the salary for the Men's Athletics Coordinator. Furthermore, Tarleton offers no evidence that it was standard practice for one women's sport to subsidize the entire salary of a position intended to coordinate all women's sports.

**60.** 1995–96 Budget at 2146, Lowrey Affidavit, Ex. 2. Tarleton argues that the payment of administrative salary to Stevenson, a woman, undermines Lowrey's argument that Tarleton discriminated against her because of her gender. (Defendants' Amended Motion for Summary Judgment at 8) An equally reasonable inference is that Tarleton only began paying Stevenson an administrative salary because it realized that it had not been paying Lowrey an administrative salary when it should have done so. The jury will decide which interpretation is correct.

(1) she engaged in activity protected by Title VII;

(2) her employer took an adverse employment action against her; and

(3) a causal connection exists between the protected activity and the adverse employment action.

See *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). The "adverse employment action" must be an "ultimate employment decision," such as hiring, granting leave, discharging, promoting, or compensating. *Id.* at 707; *Dollis v. Rubin,* 77 F.3d 777, 782 (5th Cir.1995). The only adverse action Lowrey identifies in her responses to Defendants' Amended Motion for Summary Judgment on her Title VII retaliation claims is her removal as Women's Athletics Coordinator.

■ Tarleton argues that Lowrey cannot make a *prima facie* case of Title VII retaliation because her removal as Women's Athletics Coordinator was not an adverse employment action. Title VII's antiretaliation provisions address ultimate employment decisions, not "interlocutory or mediate" decisions that might lead to ultimate decisions. *Mattern,* 104 F.3d at 708. Employment actions having only a tangential effect on an ultimate decision are not sufficient to raise a claim of retaliation under Title VII. *Dollis,* 77 F.3d at 781–82. Tarleton argues that because Lowrey's demotion was not one of the five employment actions classified as adverse in *Mattern* (*i.e.,* hiring, granting leave, discharging, promoting, and compensating), it does not constitute an ultimate employment decision.

■ Demotion is the opposite of promotion. If promotion is an ultimate employment decision, so is demotion. As Women's Athletics Coordinator, Lowrey held a quasi-administrative position with supervisory responsibility over other women's athletics coaches. Whether characterized as a demo-

tion or a discharge from the position of Women's Athletics Coordinator, Lowrey's removal from the position was an adverse employment action.[61]

Tarleton does not challenge the remaining elements of Lowrey's *prima facie* case and has not offered any legitimate, nondiscriminatory reasons for Lowrey's demotion. The court will therefore deny summary judgment on her Title VII retaliation claim.

### B. Title IX

#### 1. *Legal Standards*

Title IX commands that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (1994). While Title IX does not expressly allow private suits for violations of its provisions, the Supreme Court held in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979), that Title IX implies a cause of action. This implied cause of action extends to actions for damages as well as injunctive relief. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208 (1992).

In *Lakoski v. James,* 66 F.3d 751, 758 (5th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 357, 136 L.Ed.2d 249 (1996), the court held that Title IX does not imply a cause of action for employment discrimination because Title VII already prohibits such conduct. However, in an appeal from Lowrey's first suit, the Fifth Circuit held that "Title IX affords a right of action for *retaliation* against employees of federally funded educational institutions." *Lowrey I,* 117 F.3d 242, 249 (5th Cir.1997) (emphasis added). The *Lowrey I* court examined Department of Education regulations promulgated under Title IX and concluded that they implied a cause of action for retaliation. *Id.* at 254 (examining 34 C.F.R. § 100.7(e) (1997)).[62]

---

**61.** Tarleton did not lower Lowrey's salary when it demoted her. (November 4, 1994, memorandum from McCabe to Lowrey, Lowrey Ex. 50) However, this proves little because, as discussed earlier, Lowrey raises an issue of fact as to whether Tarleton ever paid her for her work as Women's Athletics Coordinator. *See supra* sec-

tion III. Tarleton could not take away her coordinator's salary if it never paid her one in the first place.

**62.** 34 C.F.R. § 100.7(e) (1997), states:
*Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate,

While the *Lowrey I* court held that Title IX implies a retaliation claim, the court did not address what substantive legal standards apply to such a claim. Tarleton contends that this court should apply the same rules that courts use for Title VII retaliation claims. After carefully reviewing *Lowrey I* and the treatment of Title IX retaliation claims by other courts, the court generally agrees with Tarleton.

The *Lowrey I* court stated that courts should interpret the antiretaliation provisions of Title IX and 34 C.F.R. § 100.7(e) in accordance with the antiretaliation provisions of Title VII and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(e) (1994). *See Lowrey I*, 117 F.3d at 252 n. 18. Several other circuit and district courts have applied Title VII's burden-shifting scheme and *prima facie* case requirements to the Title IX retaliation claims before them. *See, e.g., Brine v. University of Iowa*, 90 F.3d 271, 273, 275–76 (8th Cir.1996) (applying Title VII's *prima facie* case standard for retaliation claims to the plaintiff's Title IX retaliation claim and holding that Title VII's employment discrimination standards should apply to claims under Title IX), *cert. denied*, —— U.S. ——, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997); *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 251 (2d Cir.1995) (modifying the Second Circuit's *prima facie* case standard for Title VII retaliation claims to analyze a student's Title IX retaliation claim); *Preston v. Com. of Virginia ex rel. New River Community College*, 31 F.3d 203, 207 (4th Cir.1994) (holding that Title IX retaliation claims should be construed in the same way as Title VII retaliation claims); *Nelson v. University of Maine Sys.*, 923 F.Supp. 275, 279 n. 4 (D.Me. 1996) ("Courts generally look to Title VII, 42 U.S.C. § 2000e, to supply the legal standards for both Title IX discrimination and retaliation claims."); *Clay v. Board of Trustees of Neosho County Community College*,

905 F.Supp. 1488, 1495 (D.Kan.1995) ("Title VII, rather than Title VI, is the most appropriate analogue in defining title IX's substantive standards.").

■ The court concludes that Lowrey's Title IX retaliation claim is best analyzed under the standard *Burdine–McDonnell Douglas* burden-shifting scheme for employment discrimination claims. Absent direct evidence of retaliation, Lowrey has the initial burden of establishing a *prima facie* case of retaliation in violation of Title IX. If she meets this burden Tarleton may rebut her *prima facie* case by articulating legitimate, nondiscriminatory reasons for its conduct. If Tarleton meets its burden, the inference of unlawful retaliation dissolves and Lowrey must establish that Tarleton's proffered reasons are pretexts for unlawful behavior. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992); *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1326 (5th Cir.1991); *see generally Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Tarleton argues that in a Title IX retaliation case the court should require the same three elements of a *prima facie* case that are required for Title VII retaliation claims.[63] While that test provides a helpful guide for establishing a *prima facie* case under Title IX, the court must modify it to comply with *Lowrey I* and to conform to the specific activities governed by Title IX.

Because a Title IX retaliation claim only covers conduct protected by Title IX, a plaintiff may only recover under Title IX when the defendant retaliated against her "solely as a consequence of complaints alleging noncompliance with the substantive provisions of Title IX." *See Lowrey I*, 117 F.3d at 248, 254. Therefore Lowrey must first establish as part of her *prima facie* case that she engaged in activity protected by Title IX, not Title VII.

---

threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this part.

While this provision was originally promulgated under Title VI of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000d to 2000d–1 (1994), the Department of Education incorporated and applied it by reference to Title IX. *See* 34 C.F.R. § 106.71 (1997); *Bowers v. Baylor Univ.*, 862 F.Supp. 142, 146 (W.D.Tex.1994).

**63.** *See supra* section IV.A.

█ A Title IX retaliation claim is not limited to actions by an employer against an employee. If Title IX retaliation claims were so limited, students who are not employed by an educational institution would have no protection under Title IX against retaliation by their school.[64] Title IX protects "any individual" who complains about or helps investigate alleged violations of Title IX. *See* 34 C.F.R. § 100.7(e) (1998); *Lowrey I,* 117 F.3d at 250–51. In addition, while Title VII protects against employment discrimination, Title IX prohibits gender discrimination in educational programs. *See Lowrey I,* 117 F.3d at 247–48; *Lakoski v. James,* 66 F.3d 751, 753 (5th Cir.1995). Retaliation claims brought under Title IX protect against a broad array of retaliatory conduct unrelated to employment.

█ With these distinctions in mind, the court concludes that in order to establish a *prima facie* case of retaliation under Title IX Lowrey must show that:

(1) she engaged in activities protected by Title IX;

(2) Tarleton took adverse action against her; and

(3) a causal connection exists between her protected activities and Tarleton's adverse action.

2. *Analysis*

(a) *prima facie case*

Tarleton argues that Lowrey cannot establish a *prima facie* case of retaliation because

(1) its actions do not constitute an ultimate employment decision; [65]

(2) Lowrey could not articulate any discriminatory actions against her at her deposition; [66] and

(3) there was no causal connection between Tarleton's failure to promote her and her activities protected by Title IX.[67]

Because Tarleton does not deny that Lowrey engaged in activities protected by Title IX, the court's evaluation of Tarleton's arguments must focus on the second and third elements of Lowrey's *prima facie* case.

(1) *adverse action*

Tarleton proceeds under the mistaken assumption that Title IX only protects against adverse *employment* actions that constitute ultimate *employment* decisions. As explained above, Title IX is not limited to employment decisions; it protects against a broader range of retaliatory conduct.

Lowrey alleges that after she spoke out on Title IX issues Tarleton:

(1) did not promote her to Athletics Director;

(2) limited her authority as Women's Athletics Coordinator;

(3) increased her duties as Women's Athletics Coordinator without a commensurate increase in compensation;

(4) unjustifiably reprimanded her;

(5) isolated and harassed her in the workplace;

(6) withdrew staff support for her;

(7) withdrew support for the women's basketball team; and

(8) demoted her from the position of Women's Athletics Coordinator.[68]

Lowrey fails to explain or support with summary judgment evidence many of these allegations.[69] She does not explain how Tarleton limited her authority, increased her duties, or isolated and harassed her. Her complaints regarding withdrawn support for her and her team focus on personality conflicts and personal behavior, which are not the type of adverse actions protected by Title IX.

---

**64.** Other courts have considered retaliation claims brought by students against universities. *See, e.g., Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir.1995); *Topol v. Trustees of the Univ. of Pennsylvania,* 160 F.R.D. 474 (E.D.Pa.1995).

**65.** Amended Motion for Summary Judgment at 1.

**66.** Defendants' Reply at 12.

**67.** Defendants' Reply at 13.

**68.** Plaintiff's Supplemental Response ¶ I(a).

**69.** Lowrey did not list this conduct in her response to the Amended Motion for Summary Judgment; instead, she did so in her *supplemental* response, filed after the defendants' replied to her initial response. Moreover, rather than citing to specific documents, affidavits, or deposition testimony in the record that would support each item, she argues generally that "[t]he facts referenced on [p]ages 7–9 of Plaintiff's Response are relied on as facts raising a material issue in support of Plaintiff's claim for violation of her free speech as well as her claim of retaliation under Title IX" and that "the facts stated in Paragraphs 35, 38–43, 52–55, 61–76 of Plaintiff's

██ Tarleton admits that it did not promote Lowrey to Athletics Director, and the court has already concluded that Lowrey's alleged demotion was an adverse action.[70] The record also reflects that Lowrey received a reprimand in the fall of 1994 as a result of a secondary violation of NCAA recruiting regulations.[71] Lowrey argues and has submitted evidence that this disciplinary action was more severe than appropriate under the circumstances and was an act of retaliation against her. The court therefore concludes that Lowrey has satisfied the adverse action element of her *prima facie* case as to three allegedly retaliatory acts:

(1) Tarleton's failure to promote her to Athletics Director;

(2) her demotion from the position of Women's Athletics Coordinator; and

(3) Tarleton's reprimand of Lowery.[72]

### (2) *causal connection*

██ Lowrey never explains or offers evidence showing how her Title IX activities led to the reprimand she received after the recruiting violation. Although Lowrey attempts to show a causal connection between Tarleton's failure to promote her to Athletics Director, she fails to submit sufficient evidence to raise an issue of fact.

In January of 1993 President McCabe appointed Lowrey to the newly formed Special Task Force to Study Gender Equity.[73] In February of 1993 Lowrey sent a letter to McCabe complaining of continuing gender-equity problems in the Athletics Department.[74] McCabe responded by a February 16, 1993 memorandum, copying Dr. Koy Floyd.[75] Because McCabe sent a copy of his memorandum to Dr. Floyd, a jury could infer that McCabe had also communicated Lowrey's gender-equity complaints to Dr. Floyd. Dr. Floyd was a member of the committee charged with recommending the new Athletics Director. Lowrey thus raises the question whether Dr. Floyd was biased against her because of her advocacy of gender equity issues when the committee met to recommend the new Athletics Director.

This is the only admissible evidence offered by Lowrey that any of the committee members failed to recommend her for Athletics Director because of her gender-equity complaints. Although she alleges in her affidavit that a second member of the committee, Dr. Lamar Johanson, was also biased,[76] there is no competent evidence to support this allegation. In August of 1993, Lowrey delivered the results of a survey she had conducted of women athletes at Tarleton regarding gender-equity issues to then-Athletics Director Dr. Ron Newsome; the Gender Equity Task Force Chair, Dr. Patricia Zelman, and the Chairman of the Physical Education Department, Dr. Joe Gillespie. Dr. Newsome was highly critical of Lowery for sharing her survey results outside the task force, characterizing her conduct as "high

Affidavit and the deposition excerpts cross-referenced to the paragraphs ... also support Plaintiff's position." (Plaintiff's Supplemental Response at ¶ I(a))

Relying on prior briefs to establish facts will not suffice under Rule 56. Moreover, using general string citations that do not focus the court's attention on specific evidence creates a risk that the court will not find the evidence that supports the party's position.

Nevertheless, because Lowrey has submitted and identified evidence supporting three of the eight adverse actions she lists, the court will not dismiss this claim in its entirety due to a lack of summary judgment evidence.

70. *See supra* section IV.A.

71. October 11, 1994, letter from Reisman and Lamar Johanson (Institutional Athletics Representative) to Fred Jacoby (Lone Star Conference Commissioner) at 2, Lowrey Affidavit, Ex. 52.

72. This conclusion also disposes of Tarleton's argument that Lowrey could not establish her *prima facie* case because she could not articulate particular discriminatory actions at her deposition. Lowrey has submitted documents in support of these three actions. Moreover, Tarleton does not deny that it did not promote her, that it "reassigned" her from her position of Women's Athletics Coordinator, or that it reprimanded her for the NCAA recruiting violation. Regardless of Lowrey's inarticulate deposition, she has therefore submitted summary judgment evidence to support these three instances of adverse action.

73. January 28, 1993, memorandum from McCabe to Lowery, *et al.*, Lowrey Affidavit, Ex. 23; Lowrey Affidavit ¶ 40.

74. February 11, 1993, letter from Lowrey to McCabe, Lowrey Affidavit, Ex. 24.

75. Lowrey Affidavit, Ex. 25.

76. Lowrey Affidavit ¶ 43.

level unprofessional" and insubordinate.[77] Lowrey alleges that "Dr. Newsome *reportedly* shared the report with Dr. Johanson"[78] (emphasis added). This hearsay statement is not competent as summary judgment evidence. *Pan–Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir.1980).

Aside from her allegations regarding Dr. Floyd, who was only one of the four members of the selection committee, Lowrey offers no other admissible evidence that the committee was biased against her, let alone that such bias resulted from her Title IX activities. Lowrey presents no evidence that Dr. Floyd carried his alleged bias into the selection process or that he persuaded the other members of the committee not to recommend her for Athletics Director. The court concludes that Lowrey has failed to establish a causal link between her protected Title IX conduct and Tarleton's failure to promote her to Athletics Director.

■■■ Lowrey does offer evidence raising an issue of fact as to the causal link between her Title IX conduct and her demotion. On October 26, 1994, Reisman sent a memorandum to President McCabe recommending Lowrey's reassignment. In this memorandum Reisman complained that "Ms. Lowrey has taken her concerns, complaints, and issues directly to others on campus outside the Athletics Department since the beginning, effectively undermining any viable working relationship we might have had."[79] McCabe

acted on Reisman's recommendation and demoted Lowrey. There is thus some evidence that Reisman based his demotion recommendation in part on his displeasure with Lowrey's Title IX conduct.

In summary, Tarleton does not deny that Lowrey engaged in conduct protected by Title IV, and Lowrey has established issues of fact as to whether Tarleton took adverse action against her in the form of her demotion, her reprimand, and Tarleton's failure to promote her to Athletics Director. However, Lowrey has only offered evidence of a causal link between her protected Title IX conduct and her demotion. Lowrey has therefore established a *prima facie* case only as to her demotion.

(b) *Tarleton's reasons for its action*

Under *Burdine* and *McDonnell Douglas*, the burden shifts to Tarleton to articulate legitimate, nondiscriminatory reasons for Lowrey's demotion. Because Tarleton has not attempted to do so the court will deny summary judgment on Lowrey's Title IX retaliatory demotion claim. The court will grant summary judgment as to the remainder of Lowrey's Title IX retaliation claim.[80]

## C. First Amendment and Section 1983

Lowrey alleges that Tarleton and the individual defendants violated the First and Fourteenth Amendments to the Constitution by retaliating against her for speaking out. The individual defendants all raise the defense of qualified immunity, arguing that Lowrey cannot meet the heightened pleading standard and that Lowrey cannot overcome

---

77. Marginal Notes by Newsome on Memorandum from Lowrey to Newsome and Dr. Joe Gillespie [undated], Lowrey Affidavit, Ex. 27.

78. Lowrey Affidavit ¶ 43.

79. October 26, 1994, memorandum from Reisman to McCabe, Lowrey Affidavit, Ex. 49. An earlier draft of this memorandum was more explicit: "[S]he was taking her complaints and issues directly to the Gender Equity Task Force in an effort to circumvent the established reporting relationship." (October 26, 1994, draft memorandum from Reisman to McCabe at 1, Lowrey Affidavit, Ex. 49).

80. Tarleton has articulated legitimate, nondiscriminatory reasons for its decision not to promote Lowrey to Athletics Director. Tarleton lists the following reasons why McCabe decided to promote Reisman to Athletics Director instead of Lowrey:

 (1) the selection committee recommended Reisman;

(2) Reisman had prior administrative experience as Assistant Athletics Director at Tarleton;

(3) Reisman was familiar with different levels of intercollegiate athletics;

(4) Reisman had coached at six different universities, including Tarleton, as well as at the high school level;

(5) Reisman showed fundraising potential; and

(6) Reisman had "cogently and compellingly" articulated an attractive vision for Tarleton athletics.

(Defendants' Reply at 11–12; McCabe Affidavit ¶ 1).

Lowrey has not argued or presented summary judgment evidence to support her burden of showing that these reasons were pretexts. Therefore, even if Lowrey had established a *prima facie* case of retaliation for Tarleton's failure to promote her, Tarleton would be entitled to summary judgment because Lowrey failed to show pretext.

their motion for summary judgment on qualified immunity.

### 1. *The Heightened Pleading Standard*

Actions brought under 42 U.S.C. § 1983 against state officials in their individual capacities are subject to the defense of qualified immunity. *Burns–Toole v. Byrne*, 11 F.3d 1270, 1273 (5th Cir.1994). In *Elliott v. Perez*, 751 F.2d 1472, 1473 (5th Cir.1985), the court held that when a plaintiff files a complaint that will likely provoke a qualified-immunity defense, the complaint must "state with factual detail and particularity the basis of the claim," including facts that would rebut the qualified-immunity defense. However, in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993), the Court invalidated the application of this standard in suits brought against municipalities. After *Leatherman* the Fifth Circuit modified its heightened pleading rule. In *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995) (*en banc*), the court held:

> When a public official pleads the affirmative defense of qualified immunity *in his answer*, the district court *may*, on the official's motion or on its own, require the plaintiff to reply to that defense in detail. By definition, the reply must be tailored to the assertion of qualified immunity and fairly engage its allegations.[81]

*Id.* at 1433 (emphasis added).

▆▆▆▆ Under *Schultea* a plaintiff pressing claims under § 1983 must file a complaint containing a short, plain statement of the claims that relies on more than conclusory allegations. If the defendants raise a qualified-immunity defense in their answer, the court may in its discretion require that the plaintiffs file a reply addressing the defendants' qualified-immunity claim. If a reply that better details a plaintiff's claims would assist in resolving the question of qualified immunity, the court's discretion to forego ordering a reply narrows. *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir.1996); *Schultea*, 47 F.3d at 1433.

▆▆▆▆ The court did not order Lowrey to file a reply to the defense of qualified immunity asserted in the individual defendants' answer. Instead, the court ordered Lowrey to amend her complaint to meet the defendants' qualified-immunity defense.[82] Lowrey then filed her Second Amended Complaint. Her Second Amended Complaint and responsive briefs to the Defendants' Amended Motion for Summary Judgment satisfy the requirements of *Schultea.* In her Second Amended Complaint Lowrey alleges in detail the discriminatory and retaliatory acts of McCabe, Reisman, and Johanson. She relates specific instances of alleged retaliatory conduct, and she explains the alleged roles of the individual defendants in several allegedly retaliatory incidents.[83] With respect to Johnson, however, Lowrey does not provide the same detail. All that she alleges is that "Johnson [was] an active participant and decision-maker in actions described above relating to enforcement of NCAA rules."[84]

Lowrey's Response and Supplemental Response to Defendants' Amended Motion for Summary Judgment also provide extensive explanations about the conduct of McCabe and Reisman.[85] Again, however, Lowrey of-

---

81. As authority the court relied on Fed.R.Civ.P. 7(a), which states:

> There shall be a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served. No other pleading shall be allowed, *except that the court may order a reply to an answer or a third-party answer.*

(emphasis added).

82. August 22, 1997, Hearing Minutes and Order [Docket Entry No. 27].

83. Second Amended Complaint ¶ 62(a)–(c).

84. Second Amended Complaint ¶ 62(d).

85. Plaintiff's Response to Defendants' Amended Motion for Summary Judgment at 5–11.

fers no details as to Johnson's conduct, other than a general statement that "Defendants Johanson and Johnson were an integral part of providing the blocks for Reisman to use to build his case to justify removal of Plaintiff from the coordinator's position."[86] While her description of Dr. Johanson's conduct is not as detailed as her descriptions of McCabe and Reisman's actions, the court concludes that the following allegation if proven, would be sufficient to overcome Johanson's qualified immunity defense.

Johanson did participate in the selection of Reisman as A.D. after he complained stridently about Plaintiff's lack of professionalism in distributi[ng] the gender equity survey report. Johanson also presided over the NCAA investigation that related to a two-minute return telephone call that Plaintiff made to a student who enrolled three days later at Tarleton and who had previously participated in athletics at another school but wanted to come to Tarleton in the fall of 1993. Johanson's factfinding body disregarded the parents' statements, the student's statement[,] and the Plaintiff's statement relating to this incident and recommended imposing severe sanctions on the student and the Plaintiff. When the self-report violation was reviewed by NCAA staff, the compliance staff said the student had not been recruited by anyone else and had few, if any, options when she called Tarleton inquiring about opportunities to play basketball there. The investigation into this matter was conducted in a manner vastly different from any other such inquiry.[87]

These allegations detail with particularity the specific retaliatory conduct that Dr. Johanson allegedly took against her.

The court concludes that Lowrey has met the *Schultea* heightened pleading standard with respect to McCabe, Reisman, and Johanson, but not as to Johnson.

### 2. *Summary Judgment Based on Qualified Immunity*

 Qualified immunity shields public officials performing discretionary functions from liability for suits brought against them in their individual capacities unless their conduct violates clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir.1995). The protection afforded by qualified immunity is "immunity from suit, not simply immunity from liability." *Gibson*, 44 F.3d at 277 (quoting *Geter v. Fortenberry*, 849 F.2d 1550, 1552 (5th Cir.1988)). In evaluating defendants' assertions of qualified immunity the court must follow the two-step process outlined in *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The court must determine

(1) whether the plaintiff has shown a violation of a constitutional right; and

(2) whether the constitutional right was clearly established when the action at issue occurred.

*See Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir.1995); *Pfannstiel v. Marion*, 918 F.2d 1178, 1183 (5th Cir.1990). Unlike other affirmative defenses, the plaintiff has the burden of proof on these elements. *See Burns–Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir.1994); *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir.1992).

The first element requires a straightforward legal analysis of Lowrey's claims. Under the second element, Lowrey must demonstrate that the particular right she asserts was clearly established at the time of the defendants' conduct. *See Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir.1994). To do so, Lowrey must show that "the contours of the right were so clear at the time the officials acted that a reasonable official would have understood that what he was doing violated that right." *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir.1988) (quoting *Solomon v. Royal Oak Township*, 842 F.2d 862, 866 (6th Cir.1988)); *accord Tompkins*, 26 F.3d at 606. The specific action at issue need not have explicitly been held unlawful, but "the unlawfulness of the official action must be apparent in light of pre-existing law." *Brawner*, 855 F.2d at 192 (quoting *Solomon*, 842 F.2d at 866); *accord*

---

**86.** Plaintiff's Response to Defendants' Amended Motion for Summary Judgment at 10.

**87.** Plaintiff's Response to Defendants' Amended Motion for Summary Judgment at 11.

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Lowrey alleges that defendants violated her First and Fourteenth Amendment rights by retaliating against her for complaining about gender inequity at Tarleton. The Supreme Court has made it clear that states "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *See, e.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). More specifically, the First and Fourteenth Amendments forbid government officials from retaliating against state employees for exercising their right of free speech. *See Click v. Copeland,* 970 F.2d 106, 110 (5th Cir.1992); *Brawner,* 855 F.2d at 191. However, this protection is not absolute; it is balanced against the states' legitimate interests in effectively managing their employees. *See Connick,* 103 S.Ct. at 1687.

As a threshold matter the defendants argue that one of the retaliatory acts alleged by Lowrey, demotion from Women's Athletics Coordinator, is not the kind of retaliatory act forbidden by the First and Fourteenth Amendments and § 1983. According to the defendants, these Amendments only prohibit "adverse employment actions," such as discharges, demotions, refusals to promote, and reprimands.[88] Relying on *Kelleher v. Flawn,* 761 F.2d 1079 (5th Cir.1985), the defendants contend that a defendant does not violate the Constitution when a state employee is simply "reappointed" to her former position at the same pay but with reduced duties.

The *Kelleher* court never addressed the question of what type of retaliatory act will raise a claim of retaliation under the First and Fourteenth Amendments. The court simply held that the plaintiff's protected speech was not a substantial or motivating factor in her discharge. *See id.* at 1085. The language at page 1086 that the defendants cite in their brief addresses the plaintiff's due process claims, not her First Amendment claims. The court held that "reappointment with reduced duties" does not constitute constructive discharge and that the state did not deprive the plaintiff of a property interest in violation of the *due process clause* of the Fourteenth Amendment. *See id.* at 1086. The *Kelleher* opinion says nothing about what adverse actions constitute retaliation in violation of the First and Fourteenth Amendments.

It is true that only adverse employment actions will raise a First Amendment retaliation claim. *See Southard v. Texas Bd. of Crim. Justice,* 114 F.3d 539, 555 (5th Cir.1997). However, "a public employee will not be foreclosed from § 1983 relief merely because the impermissible retaliation did not result in the termination of his employment." *Click,* 970 F.2d at 109 (quoting *Bickel v. Burkhart,* 632 F.2d 1251, 1255 n. 6 (5th Cir.1980)). Adverse employment actions in the context of § 1983 First Amendment claims include (1) discharge; (2) demotion; (3) transfer, even without a salary reduction; (4) refusal to hire; (5) refusal to promote; and (6) reprimand. *See Southard,* 114 F.3d at 555; *Click,* 970 F.2d at 110. The court has already concluded that Lowrey's removal as Women's Athletics Coordinator constituted a demotion from that position.[89] Her removal from the position thus constituted an adverse employment action forbidden by the First Amendment if it was in retaliation for exercising her free-speech rights. The court therefore rejects defendants' argument that their conduct did not constitute a retaliatory act.

For Lowrey to succeed on her First Amendment retaliation claim she must establish that

(1) her speech related to matters of public concern;

(2) her interest in expressing these comments outweighed Tarleton's interest in efficient management of its services; and

(3) her expression caused the retaliatory acts of which she complains.

*See, e.g., Jones v. Collins,* 132 F.3d 1048, 1053 (5th Cir.1998); *Cabrol v. Town of Youngsville,* 106 F.3d 101, 108 (5th Cir.1997); *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1050 (5th Cir.1996); *Click v. Copeland,* 970 F.2d 106, 113 (5th Cir.1992); *Kinsey v. Sala-*

---

**88.** Defendants' Amended Motion for Summary Judgment at 9.

**89.** *See supra* section IV.A.

do Indep. Sch. Dist., 950 F.2d 988, 992 (5th Cir.1992) (en banc); Coughlin v. Lee, 946 F.2d 1152, 1156–57 (5th Cir.1991); Dorsett v. Board of Trustees for State Colleges & Universities, 940 F.2d 121, 125 (5th Cir.1991); Brawner v. City of Richardson, 855 F.2d 187, 191 (5th Cir.1988). The defendants argue that Lowrey's speech was not constitutionally protected because it did not relate to a matter of public concern and that, even if it was protected, her speech was not a substantial or motivating factor in her demotion. Because defendants do not address whether Tarleton's interest in effective management outweighed Lowrey's interest in free expression, the court will not examine this element of Lowrey's First Amendment retaliation claim.

Speech concerning public issues is central to the First Amendment and enjoys special protection under the Constitution. *Thompson v. City of Starkville*, 901 F.2d 456, 461 (5th Cir.1990). Defining what issues are of a public concern, however, has proven difficult. *See id.* ("The definition of the term 'public concern' is far from clear-cut."). A state employee's speech addresses matters of public concern if she "speaks primarily as a citizen rather than as an employee, or if the information conveyed is 'of relevance to the public's evaluation of the performance of governmental agencies.'" *Coughlin*, 946 F.2d at 1157 (quoting *Day v. South Park Indep. Sch. Dist.*, 768 F.2d 696, 700 (5th Cir.1985)) (quoting *Davis v. West Community Hosp.*, 755 F.2d 455, 461 (5th Cir.1985)); *accord Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir.1991).

■ Speech on issues of public concern does not lose its First Amendment protection merely because it is tinged with an element of the speaker's personal interest. *Dodds*, 933 F.2d at 273; *Thompson*, 901 F.2d at 463; *see Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir.1992). In other words, a speaker does not lose First Amend-

ment protection simply because she had mixed motives for commenting on a matter of public concern. Courts must examine the content, form, and context of the speech as revealed by the entire record to decide whether the speech relates to a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Wallace*, 80 F.3d at 1050; *Wilson*, 973 F.2d at 1269; *Kinsey*, 950 F.2d at 992; *Coughlin*, 946 F.2d at 1156; *Dorsett*, 940 F.2d at 125; *Dodds*, 933 F.2d at 274; *Nieto v. San Perlita Indep. Sch. Dist.*, 894 F.2d 174, 178–79 (5th Cir.1990); *Brawner*, 855 F.2d at 191.

■ The defendants argue that Lowrey's comments criticizing Tarleton's compliance with Title VII and Title IX were not protected speech because

(1) she made them in private and

(2) they dealt with matters of personal, not public concern.[90]

The defendants' first argument relates to the form and context of Lowrey's speech. They contend that Lowrey only spoke to "her supervisor, her lawyers, and her psychologist" about Tarleton's gender-equity problems and that, as such, "[t]his is a situation where Lowrey was talking to her employer as an employee only, not as a private citizen."[91] In her deposition, however, Lowrey testified that she spoke about these issues not only to Reisman (her supervisor), her lawyers, and her psychologist, but also to President McCabe, the EEOC, Tim Stoner (attorney for the Women's Basketball Coaches Association), Dr. Pat Zellman (chair of the Gender Equity Task Force at Tarleton), and an employee at the Texas Faculty Association.[92] Moreover, the *Stephenville Empire-Tribune* interviewed Lowrey and published her comments in at least two articles during the summer of 1994.[93] Lowrey has thus raised a fact issue as to the public nature of her comments.[94]

---

**90.** Defendants' Amended Motion for Summary Judgment at 8.

**91.** *Id.*

**92.** Lowrey Deposition at 134–38.

**93.** *See* Mike Pender, *Gender equity hits home for Tarleton*, Stephenville Empire–Trib., July 31, 1994, at B1; Mike Pender, *Lowrey; input absent*

on Title IX issues, Stephenville Empire–Trib., July 31, 1994, at B1, Lowery Affidavit, Ex. 42.

**94.** Although the evidence shows that Lowrey was "speaking out" on gender equity issues, the court's analysis of the form and context of her speech is somewhat hindered by the failure of any of the parties to state exactly what Lowrey said or wrote.

■ Moreover, even if Lowrey had limited her audience to Reisman, her psychologist, and her lawyer, the court would not conclude that her speech was of a private rather than a public *concern.* Speech does not lose First Amendment protection simply because a public employee makes her comments privately to her supervisor rather than openly in public. *See Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979); *see also Thompson,* 901 F.2d at 466 ("The fact that Thompson chose to communicate his grievances in a private, internal manner, instead of seeking to publicize his complaints, ... fails to dispose of the issues of whether his alleged speech related to a matter of public concern."). A contrary rule "would mean that loyal employees seeking to rectify problems would lose constitutional protection for attempting to correct problems inhouse." *Thompson,* 901 F.2d at 467.

Lowrey made her comments against a backdrop of considerable debate in the Tarleton community about the university's compliance with federal laws prohibiting sex discrimination and requiring equitable funding for women's athletics. *Cf. Tompkins v. Vickers,* 26 F.3d 603, 607 (5th Cir.1994) ("'Tompkins' complaints [about canceling an art program at a predominantly black junior high school] were made against a backdrop of widespread debate in the Greenville community regarding the art program and other aspects of Vickers' management of the school system."); *Dorsett,* 940 F.2d at 125 (concluding that the speech at issue was not a matter of public concern in part because the plaintiff's complaints were not made against a backdrop of continuing public debate about the university). Indeed, Lowrey was a member of the task force McCabe established for investigating the university's compliance with Title VII and Title IX. The court concludes that the form and context of Lowrey's speech shows it to have related to matters of public concern.

The defendants next argue that Lowrey's speech was not a matter of public concern because it dealt with matters of personal interest.[95] Lowrey was a woman coach of a women's basketball team at a public university governed by Title IX. Lowrey's status as Women's Athletics Coordinator and as the only female head coach made her the principle advocate for women athletes at Tarleton. Indeed, her job description as Women's Athletics Coordinator provided that she serve as an advocate for women's athletics.[96] Her duty of advocacy as well as her membership on the gender equity task force all but mandated that she actively seek gender equity in the Athletics Department. Moreover, as a head coach and Women's Athletics Coordinator, Lowrey had a particularly intimate and thorough understanding of the gender-equity problems in Tarleton's athletics program. After nearly twenty years of coaching and teaching at Tarleton she was perhaps the most likely person at Tarleton to have developed an informed opinion as to how the university could better comply with federal law. *See Pickering v. Board of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968) (declaring that "[t]eachers are, as a class, the members of the community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent"). Even if Lowrey had an element of personal interest in achieving gender equity at Tarleton, her mixed motives will not convert otherwise public issues into private ones.

The issue turns on the content of Lowrey's speech. Numerous cases have concluded that comments about how public institutions fund themselves and their programs are of public concern. *See, e.g., Pickering,* 88 S.Ct. at 1736; *Tompkins,* 26 F.3d at 606–07; *Brown v. Texas A & M Univ.,* 804 F.2d 327, 337 (5th Cir.1986). Complaints about sexual harassment at public educational institutions are also "of great public concern." *Wilson v. UT Health Ctr.,* 973 F.2d 1263, 1269 (5th Cir.1992). To the extent that Lowrey complained of Tarleton's failure to comply with

---

**95.** The defendants do not explain the substance of this argument. They simply state in passing that "Lowrey's speech is not protected by the First Amendment because her statements were matters of personal concern" and then return to their contention that her limited audience rendered her speech private, not public. (Amended Motion for Summary Judgment at 8).

**96.** Lowrey Affidavit ¶ 38.

federal law, her speech was protected by the First Amendment as a matter of public concern. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1051 (5th Cir.1996); *Brown*, 804 F.2d at 337; *see also Lowrey I*, 117 F.3d at 251 n. 16 (dicta). The court concludes that because Lowrey made comments relating to matters of public concern, she engaged in conduct protected by the First and Fourteenth Amendments.

▮▮▮▮▮▮ Under the final element in a First Amendment retaliation claim, Lowrey must show that her speech caused the defendants to retaliate against her. *See Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir.1998). To do so, Lowrey must demonstrate that her speech was a substantial or motivating factor in the defendants' actions. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir.1992); *Coughlin v. Lee*, 946 F.2d 1152, 1156–57 (5th Cir.1991). Unlike the inquiry into the protected status of the speech, which is a question of law for the court, the inquiry on causation is a question of fact. *Click*, 970 F.2d at 113. Thus, despite the Fifth Circuit's statement in *Click* that summary judgment is ordinarily inappropriate on this issue, *see id.*, Rule 56 requires Lowrey to submit evidence that would support a finding in her favor. Although in response to the individual defendants' claims of qualified immunity Lowrey *alleges* the same instances of adverse action she alleges in her Title VII retaliation claim, the only adverse action she identifies or supports with evidence in response to defendants' motion for summary judgment on her § 1983 retaliation claim is her removal as Women's Athletics Director.[97]

In an October 7, 1993, memorandum Reisman complained to McCabe that Lowrey had discussed proposed plans for reorganizing the Athletics Department with the gender equity task force and that "all the coaches know of her discontent" with the Athletics Department.[98] When Reisman met with Lowrey to conduct her annual performance review on September 29, 1994, he again complained that Lowrey raised concerns about the Athletics Department with the gender equity task force.[99] Reisman communicated this same criticism to McCabe on October 5, 1994.[100] Three weeks later Reisman sent the memorandum to McCabe recommending Lowrey's demotion.[101] As one of the reasons for his recommendation, Reisman stated: "Ms. Lowrey has taken her concerns, complaints, and issues directly to others on campus outside the Athletics Department since the beginning, effectively undermining any viable working relationship we might have had."[102] This evidence would support a finding that Reisman recommended that McCabe demote Lowery because of her comments on Tarleton's gender-equity problems. Moreover, the evidence indicates that McCabe knew of Reisman's discomfort with Lowrey's First Amendment activities and acted upon Reisman's recommendation. The court therefore concludes that Lowrey has submitted evidence that her speech was a substantial or motivating factor in Reisman's recommendation and in McCabe's decision to demote her.

However, Lowrey fails to demonstrate how Johnson or Dr. Johanson were involved in this decision. Indeed, she even concedes that "their individual liability under the law is not so clear as the liability of Reisman and McCabe."[103] Lowrey never explains what role Johnson or Dr. Johanson played in her demotion, and she does not offer evidence that would support a finding that their alleged displeasure with her First Amendment activities was a substantial or motivating factor in their unidentified actions against her.

---

**97.** Plaintiff's Response to Defendants' Amended Motion for Summary Judgment at 6–9.

**98.** October 7, 1993, memorandum from Reisman to McCabe, Lowrey Affidavit, Ex. 34.

**99.** September 29, 1994, memorandum of Reisman to File, at 407, Lowrey Affidavit, Ex. 45.

**100.** October 5, 1994, memorandum from Reisman to McCabe, Lowrey Affidavit, Ex. 4.

**101.** The court has already discussed the contents of this memorandum and Reisman's rough draft in its analysis of Lowrey's Title IX retaliation claim. *See supra* section IV.B.

**102.** October 26, 1994, memorandum from Reisman to McCabe, Lowrey Affidavit, Ex. 49.

**103.** Plaintiff's Response to Defendants' Amended Motion for Summary Judgment at 9.

The court will therefore grant summary judgment on this claim as to these two defendants.

The court concludes that Lowrey has satisfied the first prong of the *Siegert* test by submitting evidence that defendants McCabe and Reisman violated her First and Fourteenth Amendment rights by removing her from the position of Women's Athletics Coordinator. Under the second prong of *Siegert*, the court must determine if Lowrey's constitutional right against retaliation for speech on a matter of public concern was clearly established when her demotion occurred.

In *Forsyth v. City of Dallas*, 91 F.3d 769, 775 (5th Cir.1996), the court held that "[t]he law was established clearly enough in this circuit in *January 1988* that a reasonable officer should have known that if he retaliated against an employee for exercising his First Amendment rights, he could not escape liability by demoting and transferring the employee rather than discharging him." (emphasis added) Moreover, the Supreme Court has recognized a First Amendment right against retaliation for speech on matters of public concern at least since its *1968* decision in *Pickering v. Board of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *1979* the Court held that the First Amendment prohibited retaliation for criticism by an employee made in private to a supervisor. *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). In *1986* the Fifth Circuit held that the First Amendment protected whistle blowers from retaliation. *See Brown v. Texas A & M Univ.*, 804 F.2d 327, 337 (5th Cir.1986).

The court concludes that the law, as interpreted by the Supreme Court and the Fifth Circuit, had clearly established a public employee's right of protection against retaliation for speaking on matters of public concern at the time of Lowrey's demotion on November 4, 1994. The court thus concludes that Lowrey has met her summary judgment burden of rebutting the qualified-immunity defense

of McCabe and Reisman. The court will therefore deny summary judgment as to these two defendants and will grant summary judgment for Johnson and Johanson on this claim.[104]

## V. CONCLUSION AND ORDER

Defendants' Amended Motion for Summary Judgment (Docket Entry No. 30) is **GRANTED in part** and **DENIED in part**. Because Lowrey has waived all of her due process claims and all of her claims under the Texas Constitution, the Texas Civil Practices and Remedies Code, and Texas common law, these claims are **DISMISSED WITH PREJUDICE**. Her § 1983 claims against Jim Johnson and Dr. Lamar Johanson are **DISMISSED WITH PREJUDICE**. All of Lowrey's retaliation claims are **DISMISSED WITH PREJUDICE** except her Title VII and Title IX retaliation claims against Tarleton and her § 1983 claims against Tarleton, Reisman, and McCabe arising out of her removal as Women's Athletics Coordinator. Tarleton's motion for summary judgment is **DENIED** as to Lowrey's claims of pay discrimination under Title VII and the Equal Pay Act.

---

104. Tarleton did not contest Lowrey's First Amendment retaliation claim against it. The court therefore has no reason to consider whether summary judgment would be appropriate for Tarleton.